Your Honor, before I begin, I'd note that there's not the usual timer that is up here. The little clock. Not the usual timer? Where did the timer go? Madam Clerk, where's the timer? It's been expropriated. Panic sets in. Oh, no. How will he be able to argue without the timer? If Your Honor's willing, I could keep track of my own time. I'm not sure how accurate that would be. Go ahead. We'll keep track and make sure that we don't step all over your argument. You may go ahead. May it please the Court, good morning, Your Honors. I intend to reserve two minutes of my time for rebuttal, or thereabouts, with the Court's permission. You can start this clock, Madam Clerk. Go ahead. Weatherspoon complains of three variants of prosecutorial misconduct during closing argument on appeal. Precedent is clear at this point that two of those variants do constitute clear misconduct. The vouching that occurred during the closing argument, while it was clear under prior case law, was improper, but Weatherspoon's cause was greatly buttressed by this Court's recent authority in United States v. Combs, which was decided August 5, 2004, after briefing, but Mr. Weatherspoon did send in a notice to the Court of this authority under Federal Appellate Procedure 28J. Combs is remarkably similar to this case regarding the actual argument made by the prosecutor on vouching. Specifically, Combs deals with this contention that law enforcement officers would not risk their career by committing perjury by lying on the stand. Combs clearly indicates that that is improper. It's improper vouching. It is prosecutorial misconduct. Combs also is an important case for me because it talks about other aspects that are important to my case, and it substantially lessens the impact of many of the prosecutor's arguments in their answering brief. For instance, it's important to note that Combs is a plain error case. In my case, the vouching was objected to at least twice. In fact, the district court judge told the prosecutor, please refrain from vouching. The prosecutor remained undeterred and engaged in at least four separate acts of vouching that I can count from the record. What Combs also helps me with is the prosecutor's argument that this was invited error, and Combs says, relying on prior authority, that the prosecutor does not have license to commit misconduct based upon what arguments defense counsel may have made. Now, the prosecutor's argument on invited error was always tenuous because it's extremely unclear that the defense counsel made any improper arguments during his closing at all. I would submit that the defense counsel's argument was entirely proper, and indeed, many of the arguments he made are arguments traditionally made by defense counsel during closing arguments. But nonetheless, Combs establishes that invited error doctrine will not save the prosecutor, that he has no license to commit the vouch for his witnesses. And it's important to note that the vouching in this case is patent and clear. This is not Serapistis' vouching. This is a prosecutor stating from his personal opinion that the police officers got on the stand and they told the truth. It's a prosecutor stating from his personal opinion, and indeed, on one page, page 146. How do we know he was stating it from his personal opinion? He never said, it's my personal opinion that. Well, Your Honor, when you look at the actual substance of the argument, and I would direct this Court to EOR 16, trial transcript page 147, is he says, quote, the point, ladies and gentlemen, he's talking about Donald Harris, a key prosecution witness. To which no objection was made, but go ahead. Right. Well, there was an objection two pages earlier, Your Honor, I will note. He says he told the truth in the handwritten statement that he gave on the morning, on that morning. He told the truth when he came to the grand jury under oath, and he was in front of, and when he was in front of you today, he told the truth to you. That doesn't say in my personal opinion. I spent 17 years in state court and a lot of years in federal court trying cases, and this is the way people talked about the evidence. Your Honor, well, they shouldn't. The case law does establish definitively that the prosecutor has no business informing the jury what his impression of the evidence is. When you sit there. It's a colloquial way that people talk about the state of the evidence. In other words, what I'm trying to underscore here is he didn't say it's my personal opinion. When did he say this about Harris? He did say that about Vanessia Taylor, didn't he? As he said, her statement about being threatened I don't believe is truthful, ladies and gentlemen. That's true. That's true. He denigrated the defense witness, his own witness, but a witness that was favorable to the defense. That is certainly an expression of personal opinion. He also said I wouldn't trust either of these witnesses. They're asking him where's the nearest 7-Eleven if I'm driving through the neighborhood, which he also, again, says I wouldn't. That's the defense counsel. That's the defense counsel saying that. And so that gets you back to this invited error issue. This is the way people were talking about the evidence. Right. Well, Your Honor, I understand that this whole area of prosecutorial misconduct during closing is a difficult area for prosecutors because they are held to such high standards. There's a valid basis for that, and that is the prosecutor, when he stands up there in front of the jury, is painted with this imprimatur of being a government representative. The juries do look to the prosecutor for guidance. And case law carefully delineates the contours of permissible argument they can make. And many of the arguments that they make to the layperson do not seem to be improper. Well, the technical letter of the law says this is improper. Was the jury told, as juries are, that this is not evidence, that this is just a discussion of the evidence in the case? There was a general instruction to that effect, the boilerplate instruction, given it was read to the jury before closing argument. You know, I mean, lawyers tell us all the time it's a boilerplate instruction, but you don't get anywhere with that because the fiction is that that's what everybody pays attention to. It's true, Your Honor, but Combs talks about the efficacy of the general instruction. It says the instruction has some impact. Is it dispositive? No. In fact, in Combs, the general instruction was read to the jury, but in Combs, this Court decided that that did not ameliorate the misconduct and, indeed, the misconduct was enough. The closing argument alone, the Court specifically says in that case, was enough to warrant a plenary reversal. So Combs speaks to this general instruction. Does it have some – is it part of the Court's calculus? Yes. Is it dispositive? What are the statements? I think you said there's two primary statements made that you would seize on. Would you tell me which of those again? Because there's several things the prosecution says. That's a key point, Your Honor. There's at least eight or nine separate instances of misconduct. And a key thing that Combs speaks to is – Which are the most egregious? The most egregious would be on page EOR 37, trial transcript 168, finding this man guilty is going to protect other individuals in the community. That was, indeed, objected to. It's an argument intended to inflame the jury and to convict on grounds separate and divorced from the elements of the offense. The other area of argument that has been established as being clear misconduct is when the prosecutor talks about this dynamic that in order to acquit Mr. Weatherspoon, you have to believe the officers are lying. And that's exactly what Combs spoke to. That is an improper argument to make. And he says – and EOR 39, it begins, trial transcript 170, excuse me. If you believe Mr. – to paraphrase, if you believe Mr. Valladares, they must have lied at the scene. They came into court and they lied to you. They lied to this judge. They lied to me. Speaking of the – Let me back up for a second. Was the defense position was that these officers lied? Your Honor, the defense did not really – that inference is raised by the government's own witnesses. The government's own witnesses voted – Did the defense attorney argue that these witnesses lied? The defense attorney argued that the civilian witnesses lied. The defense attorney did not argue directly that the officers lied. He – Strike directly. Excuse me? Strike directly. You said they did not – he did not argue directly. He did not argue directly that these officers came up here and lied about the indecency. What does directly mean? Directly that he did not use those words. What did he use? Your Honor, I don't remember the defense – forgive me if my reading of the record is wrong. I don't remember the defense attorney talking about the officers' veracity at all during his closing. I know specifically that he did not say that those officers came up here and lied. His contention was – see, the officers are not that damaging to us because neither of the police officers saw Mr. Weatherspoon with a gun. And that's a key aspect of this case is there's no forensic evidence tying him to the gun. Mr. Weatherspoon makes no incriminating statements. The officers never saw him with a gun. We have three individuals, one gun in the car. Mr. Weatherspoon isn't even the owner of the car. So the officers are not that important to us because all the officers do is essentially say we searched the car, we found the gun. These two civilian witnesses told us that it was Weatherspoon's. Of course, one of those civilian witnesses gets on the stand and says I lied because I didn't want to lose the right to get my child back. And the other one vacillated so much that he wasn't a very credible witness. And, in fact, the government's case is particularly weak because Donald Harris is lying even under the government's theory because Harris says that Mr. Weatherspoon had the gun, but he also says that the law enforcement induced me to write a statement saying I wouldn't be arrested on the warrants. And the officers came in and said, well, we never told him that. So Harris is, you know, he's either lying about the gun or he's lying about being induced or he's lying about everything. This one important aspect of this case is this is a razor-thin case for guilt. Razor-thin. This is a case that easily could be won by defense counsel. Any misconduct here could have tipped the scales. One final point. How is it razor-thin? Where was the gun found? It was found under the seat in which Weatherspoon was sitting, but there was an individual, Mr. Harris, who was sitting right behind him. And, like I said, none of the officers saw him with the gun. The owner of the car was a convicted felon. One of her children was currently in protective custody, and she testified that she lied to the police officers to make sure that she wouldn't get in any trouble because she was afraid of losing her children. All we have are these two civilian witnesses tying Weatherspoon to the gun, and they're severely impeached. They both had incentives to lie. They both admitted to lying, or at least one of them admitted to lying, and the other one, his credibility, was seriously damaged during the trial. One final point before I sit down, I'd just like to say, is that Combs also speaks of the fact that the judge, when the judge participates in the misconduct, that that's particularly damaging. In this case, on trial transcript 168, defense counsel objects, and the trial judge basically ridicules the objection and pretty much tells defense counsel, don't object to this anymore, and immediately the prosecutor engages in more misconduct. Under Combs, that is something this court has to take into serious consideration when gauging the impact of the misconduct in this case. Thank you, counsel. We'll hear from Mr. LaHood. May it please the Court, my name is Darren LaHood. I work for the United States Attorney's Office for the District of Nevada. I want to make two points at the beginning here. First of all, when looking at the entire record of evidence in this case and what was said by defense counsel throughout this trial, there was no prosecutorial misconduct, and the record reflects that. Second point is, the proof of evidence was overwhelming in this case to the defendant's guilt, and that's evidenced by a guilty verdict of less than two hours after the close of evidence. I want to address the three points that defense counsel raised. First of all, on the issue of whether we vouch for witnesses, there's a number of different things that the defense did not talk about. In his closing statement, the defense talks about that the civilian witnesses had very, very strong motivation to lie. Mr. LaHood, could I interrupt for just a second? Because I noted that the red brief talked about what had happened in terms of the responsive closing argument, but several of the instances that counsel points to took place in your original statement, did they not? And I didn't see those talked about in the red brief. Which specific point are you talking about, Your Honor? The claim of vouching in your initial closing argument. Your Honor, if you could point me to the record on that. One thing that I did say that was never objected to, I said that Mr. Harris came in here and told you the truth. And that was a direct result of the cross-examination of Mr. Harris by defense counsel. He went after his integrity. He said that he went after, that he was not telling the truth, he was not being credible. Mr. LaHood, who's supposed to decide whether a witness tells the truth or not? That's up to the jury, Your Honor. And is, are you supposed to put your thumb on the scales? No, you're not, Your Honor. But when his credibility and his truthfulness was put forth by the defense counsel, and I might add that was never objected to, Your Honor, when that statement was put forth by myself at the time of closing argument. But he was going after his credibility, his untruthfulness at that time. Happens all the time. But in the remote precincts from which I come, prosecutors don't treat with it in that fashion. I don't know how it is around here, but they, what they do is to make the arguments to the jury from which the jury is supposed to make a determination about whether a guy was telling the truth or not, not a statement by the prosecutor. My answer to that, I was directly responding to the way that the witness was gone after and his credibility was impugned, Your Honor. And that was the response to that. Your Honor, I would argue that. Let me, you know, one thing is we're mixing and matching here the officers and the civilian witnesses. Maybe we can break them up and talk about them separately. The statement you made with respect to the officers, you said, I guess they lied to the dispatcher when they called in. They had no reason to come in here and not tell you the truth. They took the stand. If you believe defense counsel, they must have lied at the scene there, da-da-da-da-da. That's almost the same argument that was made in Coombs and was found to be improper vouching, is it not? I would initially say, Your Honor, that, first of all, that was not objected to in the closing argument. I understand. It is similar. But what's not similar is that throughout the closing argument, they accused Taylor and Harris of lying because of police coercion, police misconduct on behalf of these officers. They stated both of them. That gives you the license then to say, I guess they lied to the dispatcher when they called in. These are officers that risk losing their jobs, their pension, et cetera. I guess they're risking being prosecuted for perjury. That gives you the license to vouch in that manner in your view? Well, Your Honor, I think we have an obligation to respond when they say these officers are being untruthful, that there's misconduct, and that there's coercion by these officers, that the only reason Harris ---- Absolutely. You can say, ladies and gentlemen of the jury, where's the evidence of coercion? There's absolutely not a single piece of evidence of coercion. You don't stand up and say, ladies and gentlemen of the jury, I'm telling you there is no coercion. These guys didn't lie. They were telling the truth. If they weren't telling the truth, they would lose their job. I mean, it seems to me you might say it's a subtle difference, but there you weren't without an arsenal of evidence to argue against the defense, were you? I mean, you're holding all the cards. There was overwhelming evidence. I would agree with you on that, Your Honor. But it wasn't just once or twice. I mean, there's ten different instances of going after these officers' credibility. That's not the point. The point is how you respond. Of course they go after the officers' credibility. This happens all the time. But there are special rules for prosecutors that say that you have to make it clear that your personal opinion is not involved, that you on behalf of the government are not vouching for the witnesses, and there's not extra record material that shows they're telling the truth. You've got to be careful, according to the rules, to confine your observations to the record and to the evidence and to the reasonable inferences drawn therefrom. And there's nothing in this record about people losing their pensions, risking their livelihoods, stuff like that. I mean, that's the kind of common thing that you might talk about, but there's nothing in the record about that. I mean, the vouching rules put a special obligation on prosecutors to be careful not to throw the weight of the government personally behind a witness, but to confine the remarks to the evidence. That's the dangerous thing. I believe in getting into all of this thing. It sounds like you're personally standing up and vouching for the veracity of the witnesses. Your Honor, I would agree with that, that there was mild vouching there on behalf of the government. It was in direct response, Your Honor. But I would also argue that scenario you just gave was never objected to. So we look at the plain air standard here, Your Honor. We'll be happy to look at the plain air standard, Mr. Lloyd. Yes, sir. Your Honor, defense counsel talks about that somehow we inflamed the jury by talking about punishment here. And I want to talk about that. Two different occasions in defense closing argument, they said, your decision directly affects the life of a human being. Are you comfortable with that? Are you comfortable with affecting the life of a human being? Are you comfortable today, tomorrow? This wasn't just a casual comment. This was yelled at the jury. Again, that wasn't the only one. It continued on. Taking away a man's liberty, are you comfortable with that? Are you comfortable? I mean, that goes directly to punishment. He went on to say ---- Did you object to that? No, Your Honor, did not. You did not object. And then you came back and you said, let me tell you this, convicting Mr. Witherspoon is going to make you comfortable knowing there's not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around loaded semiautomatic to which the defense counsel did object. So, I mean, this record is kind of complete with a lot of tits for tat, admittedly. But on that issue about are you going to be comfortable having these guys walk around with guns, you didn't object to his argument. He did object to your argument. Is there any foundation in the law that permits you to make that kind of argument that you did? Well, Your Honor, when ---- Being comfortable is not really the standard. Not being comfortable ---- Beyond a reasonable doubt. But it wasn't just being comfortable. It was beyond that. It was talking about punishment. You're going to let 800 years of democracy die because you're directly affecting the liberty and the life of a human being? You know, don't fool yourselves. You're taking away a man's liberty. I mean, it wasn't just one or two or three. It was a whole slew of comments that weren't carried. It sounds like mutually assured destruction between the Soviet Union and the United States. You think the defense attorney is off the reservation, so you respond with a nuclear attack. I mean, and the case law is pretty clear, again, that prosecutors have a tough responsibility here. They're governed by different rules than defense attorneys. Defense attorneys are expected to range far and wide and attack everything that moves. But starting with Justice Sutherland's admonitions, which I'm sure you've read in Berger v. The United States, it says the government has a different obligation. And so you can't respond tit for tat, low blow for low blow. And the cases are pretty clear that it's not appropriate to tell the jurors to convict somebody just to protect society. You've got to tell them to convict somebody based on the evidence in the law. That's the problem. Your Honor, yes, I am familiar with that case. Prosecutors have to remain cool in the heat of battle. That's not my view. I mean, that's what the cases say. And I would argue, Your Honor, that it wasn't a nuclear response on our behalf. It was simply a normal response to what they said in making the jurors feel comfortable with taking a man's life and putting him in prison. And there's a standard or a normal response for that. And I don't think the government would. There are a lot of normal responses, though. And I don't think we went over the line with that response of what we said, Your Honor. Well, the D.C. Circuit would surely think you did. Starting way back in 1984, a prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in that kind of an appeal is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. It's time to clean up America. Let's get these people off the streets. But, Your Honor, I don't believe, and I don't know all the facts in that case, but I don't believe the type of statements made by defense counsel were similar in that case. I mean, these were statements made that needed to be responded to by the government. Oh, there's no doubt about that. There's a lot of ways to respond to that without stepping over the line. That's the point. I mean, as you stand here today, you, I'm sure, have thought of other ways that wouldn't touch the line, that you could respond to that evidence. Can't you? Yes. Yes is the answer to that, Your Honor. And, of course, it's always easy, of course, going back after the fact, admittedly. But the point is, here in the heat of battle, things come out. And the question, and that was your natural response, was to put this stuff out there. But that doesn't make it right, because that was what, you know, popped into your head or popped out of your mouth. What you did, basically, was make the societal closing statement. I mean, that was your closing argument about the role of the jury in society. And you wouldn't have made it but for what you think was invited error, correct? Invited error, Your Honor. And going beyond what you just said on trivializing the reasonable doubt scenario, he compared soldiers in Afghanistan and Iraq and their duty to what these jurors have. And did you object and say, you know, we don't have anybody from Iraq on trial here today, Your Honor, if we could refrain from these comments with respect to the war? Did you say that? I didn't, Your Honor. But I believe that there needs to be some reply to that when he makes that argument. Of course. You're saying he fought dirty, but the government doesn't get to fight dirty back. And, Your Honor, I think it was ‑‑ I don't think we fought dirty. I think we didn't cross that line. I think when you look at what was said in all of these instances, it was invited reply. And it was ‑‑ it went up to the line, but I don't think it crossed the line, Your Honor. I mean, it was each instance that was put forth by the defense needed to be responded to in an accurate way. The last point I want to make, the evidence was overwhelming in this case. Defense counsel didn't mention that, Your Honor, but this was less than two hours the jury came back. Mr. Harris identified ‑‑ Of course, it's less than two hours after all of this took place. Well, but here's the evidence, Your Honor. Mr. Harris got up and pointed to the defendant in open court and said, he's the one I saw with the gun on this particular day. In addition, we have two handwritten statements that came into evidence from Harris and from Taylor that both implicate the defendant had a gun, and their statements were perfectly consistent. Perfectly consistent about what happened on that night. And she recanted? The only thing she said, she said her whole statement was absolutely true, word for word, except for the point in that statement that said about the gun. So, I mean, in looking at that, that evidence is absolutely overwhelming. The other thing is they tried to say Mr. Harris could have had this gun. Well, he wasn't a convicted felon. He could possess this gun and never be charged with it. That didn't make sense. The evidence was overwhelming when we look at the facts here. The gun was found under his seat. Let me understand that. Just because he wasn't a convicted felon, that was a basis for determining that he might not have had the gun? Well, they tried to insinuate for some reason that Mr. Harris was lying and this was his gun. Right. This was his gun. Well, he could have possessed that gun. I mean, there was no – he could have possessed that gun and he would have never been charged with that. He was not a convicted felon, but he wasn't a lawyer either, was he? Was not. I don't believe he was, Your Honor, but he was. Well, he wasn't clicking through, you know, 18 U.S.C. as he was sitting in the back seat, right? I don't believe he was, Your Honor. I think that would be accurate. But the evidence was overwhelming. When we look at all of the evidence presented here and the statements and the witnesses, it was very, very clear when we look at the plain air standard, the evidence was absolutely overwhelming. I think that's clear from the record all the way through. This is another example of how important it is the how you do things is as important as what you're doing. In any event, thank you very much, counsel. Thank you. We'll give you a couple seconds to respond if you care to take it. Your Honor, I know we're running a little out of time, but I'd like to make a few key points. The first is this firearm was stolen, and additionally, it's illegal in Nevada to possess a firearm that is not registered, and the prosecutor knows that, and he knew on both of those points. The second thing is – Suggesting that Harris knew that he would be in jeopardy. That was his firearm. He knew it was stolen, or there's a good chance to know, and he certainly knew that he didn't have it registered. And this Harris individual told our investigator that he never saw Mr. Weatherspoon with a gun on that day, and the police let him go after he read out the statements, even though he had outstanding warrants, as well as the police let Ms. Taylor drive off, even though she had a suspended license, after, according to Ms. Taylor, they told her, if you write out a statement against Weatherspoon, we'll let you go on this. In my reply brief, I state a case on page 9 which says it's perfectly fine for a defense counsel to compare jury service to military service. The key point here, we seriously contest the plain error standard governance, the misconduct that occurs on page 170 of the transcript. If you look at page 168, the district court judge basically told defense counsel to quit objecting. He belittled his objections. On page 170, defense counsel objects yet again, which is overruled, and at that point defense counsel cut his losses and decided to quit objecting. But note that prosecutor's misconduct, the worst misconduct here under Combs, came right after the court overruled an objection to vouching. So once the court gave the prosecutor a license, he unleashed the full onslaught of vouching. I would submit that that's a preserved error. It should be reviewed under the harmless error standard. I briefed that extensively. The last point is the reasonable doubt, the truncation, the arguments about the reasonable doubt standard in this case is a very interesting issue. There's not a lot of case law on it. I would ask the court to take a careful look at that issue as well. Thank you, counsel. This case is ordered submitted. We'll call the next case off the calendar. Rivas is ordered submitted on the briefs. United States of America v. Hart is the next case for argument.
judges: Trott, McKeown, Shadur